Eric Nielson #5327
Laura Nielson #15008
G. ERIC NIELSON & ASSOCIATES
4790 S. Holladay Blvd.
Holladay, Utah 84117
Phone: (801) 424-9088
Fax:    (801) 438-0199
ericnielson@ericnielson.com
*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT,
DISTRICT OF UTAH, CENTRAL DIVISION**

| | |
|---|---|
| ROBERT RAUCH, LESLI RAUCH, and BRENDON RAUCH,<br><br>        Plaintiffs,<br><br>vs.<br><br>MEDICA, MEDICA HEALTH PLANS, MEDICA BEHAVIORAL HEALTH, and MEDICA CHOICE PASSPORT MN.<br><br>         Defendants. | **Complaint**<br><br><br>Case No.  2:19-cv-00002-DBP |

**COME NOW** Robert, Lesli, and Brendon Rauch, collectively and individually and through their undersigned counsel, complain and allege against the above captioned defendants as follows:

**PARTIES, JURISDICTION, AND VENUE**

1. Plaintiffs Robert Rauch ("Robert") and Lesli Rauch ("Lesli") are natural persons residing in Edina, Minnesota. They are covered by Medica Choice Passport MN, ("the Plan") provided through Lesli's employer, Bachman Wholesale Nursery and Hardscapes ("Bachman"). The Plan is administered by Medica and Medica Behavioral Health.

2. Plaintiff Brendon Rauch ("Brendon") is a resident of Portland, Maine. As a

beneficiary of his mother's health insurance plan, he received treatment at Foundation House, an aftercare program that transitions into a sober living arrangement in Portland, Maine from November 29, 2014 through June 29, 2015.

3. MEDICA is a registered service mark of Medica Health Plans. "Medica" referes to the family of health plan businesses that includes Medica Health Plans and Medica Behavioral Health. Medica does business in the state of Utah; one of Medica Behavioral Health's largest claims processing centers is located in Salt Lake City, Utah.

4. Medica also has an alliance with United Behavioral Health/Optum ("UBH/Optum). UBH/Optum manages Medica's Behavioral Health program. UBH/Optum does a considerable amount of business in Utah, both insuring and providing claim administration for Utahns.

5. The Plan is an employee benefit plan governed by the Employment Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §1001, et. seq.

6. This Court has jurisdiction over this matter and venue is appropriate pursuant to 29 U.S.C. §1132(e)(2) because the Defendants do business in the State of Utah.

7. Plaintiffs seek payment of Brendon's denied claims from January 1, 2015 through June 29, 2015 pursuant to 29 U.S.C. §1132(a)(1)(B) and pursuant to the Mental Health Parity and Addiction Equity Act of 2008 ("the Parity Act").

8. Plaintiffs also seek an award of prejudgment interest and attorney fees pursuant to 29 U.S.C . §1132(g).

## FACTUAL BACKGROUND

### Brendon's Behavioral and Substance Abuse History

9. Brendon began abusing alcohol in high school as a way of coping with disappointment and stress. His drinking altered his behavior for the worse; he started getting kicked out of class, fighting with his friends, and even began drunk driving. He totaled a car one night after a bender and had to spend the night in the hospital detoxing. He would later tell his mother that he was often black out drunk during this time.

10. After high school, Brendon began college at Iowa State University in the fall of 2009. He began to rally from the disappointments and embarrassments of high school and began to act like his old self. He received above average grades and began playing hockey again. The fresh start of college brought out the best in Brendon, as shame had been a large part of what drove him to drink.

11. Unfortunately, the improvement in Brendon's behavior did not last long. Brendon moved in with some other hockey players and soon began abusing alcohol again. Just as it did before, his alcoholism changed his behavior dramatically. He began drinking too much, smoking pot, not attending classes, and failing classes. He withdrew from his family. He dropped out of hockey, which he really enjoyed.

12. Winter break, he knocked out his front teeth-playing hockey and this began a series of medical issues and appointments. Brendon blew off appointments, frustrated the medical professionals, and was extremely unreliable.

13. Brendon had to have his teeth wired into his mouth for a month. This turned into a two-year ordeal of implants and crowns going awry. He continued to slide in school. He could

not seem to get on top of the series of cascading setbacks, many of which were caused by his decision to begin abusing alcohol again.

14. The fall of 2011, Brendon returned to Iowa State for his junior year, with sophomore status due to failed classes. He was put on academic probation. His slide continued not showing up for school, failing classes, not responding to phone calls and texts from his family. Once again, these choices were driven by Brendon drinking too much and smoking pot.

15. In December of 2011, Brendon lost a college friend and hockey teammate to a drunk driver. This devastated Brendon days before Christmas. His family thought he should withdraw from school based on the previous semester, but he felt he needed to go back and support his friends. After a week of no school engagement, his family withdrew him from school, refusing to pay for an education going to waste.

16. After moving home, Brendon's family saw firsthand what his life had become. Brendon exhibited irrational behavior following drunken nights, threats to takes his life while in a drunken stupor, and vicious behavior toward his younger siblings and parents. His family lived in terror wondering what would happen next when Brendon drank.

17. From January 2012 until September 2014, there were many episodes of binge drinking resulting in desperation, suicidal thoughts and threats, and police escorted trips to the emergency room. He could not hold a job; he had no ambition. He struggled to get out of bed. The shame of being so far behind his friends kept him in a vicious, self-destructive cycle.

18. During that same time, Brendon attempted to improve his depression by trying various antidepressants, but nothing worked. He often could not get out of bed to face the day. He struggled with his physical and mental health, the drinking prevented any medication he took

from doing their job.

19.     In February of 2014, Brendon checked himself into Hazeldon, an addiction recovery center in Plymouth, Minnesota. He checked out after ten days, at a loss for what to do next. He knew Hazeldon wouldn't be enough to stop his self-destructive patterns.

20.     Brendon and his family attempted to treat his mental health issues and alcoholism with outpatient treatment at Great Lakes Consulting to no avail. In fact, Brendon totaled another car in 2014 while driving drunk. This was the last straw for his family, who literally feared for his life. He expressed suicidal ideation and was hospitalized on multiple occasions.

21.     On September 12, 2014, Brendon entered the Legacy program in Loa, Utah with a 24-hour notice. He spent 11 weeks in the outdoor behavioral health therapy program designed for young male adults with addiction and psychological needs.

22.     By the time Brendon left the program November 25, 2014, he was physically healthy, alcohol free, and just beginning to deal with the psychological and emotional issues underlying his alcoholism. Following Thanksgiving weekend he went immediately to Maine, to attend Foundation House based on the recommendation of all of his therapists, psychiatrists, and psychologists.

23.     Foundation House is a transitional program designed to maintain the growth accomplished in residential treatment, while helping participants gain the necessary skills to cope with the world outside of treatment.  While at Foundation House, Brendon stayed sober, balanced out his medications, and gained the psychological resilience to face his life and make changes.

24.     After leaving Foundation House in July of 2015, Brendon moved in with four

other Foundation House alumni in Portland, Maine. He decided to continue seeing his psychiatrist from Foundation House on an outpatient basis, and entered college at Southern Maine University. As of December 2018, Brendon has graduated college and is finally moving forward.

25. After outpatient treatment at Great Lakes Consulting failed, Brendon's residential treatment at Legacy followed by transitional treatment at Foundation House proved to be the right combination to get Brendon back on track.

**Pre-Litigation Appeal of the Plan's Denial of Coverage for Brendon's Care**

26. Claims were submitted by the Plaintiffs to the Plan for coverage of Brendon's treatment at Foundation House.

27. The Plan denied coverage for Brendon's healthcare on the basis that additional residential treatment following his treatment at Legacy was not medically necessary.

28. Lesli appealed the denial in a letter dated December 7, 2015. In her letter, Lesli provided a history of Brendon's mental health and alcoholism struggles and argued that his care at Foundation House was medically necessary to maintain the sobriety he achieved at Legacy.

29. Lesli also pointed out that Foundation House is not a residential treatment facility, that it is a transitional care facility. She argued it fit the definition of UBH/Optum's definition of a "Sober Living Arrangement," which is a:

> "…transitional, supervised living arrangemen[t] that provide[s] stable and safe housing, an alcohol/drug-free environment, and support for recovery from alcohol or drug use. …"

30. The Plan reiterated its denial on January 4, 2016. It did not respond to Lesli's identification of Foundation House as a Sober Living Arrangement as opposed to a residential

6

treatment facility.

31. The Plan also expressed that the Plan does not provide coverage for residential substance abuse treatment that provide less than 30 hours per week of eligible treatment services.

32. No such qualitative treatment limitation exits in the plan for analogous medical or surgical benefits, which is a violation the Parity Act.

33. Lesli appealed again on December 20, 2016. She argued that the reviewing physician, Dr. Smith, did not thoroughly read her first level appeal, as he continued to claim that Foundation House was a residential treatment facility and therefore not covered nor medically necessary.

34. Lesli also questioned the qualifications of Dr. Smith. She wrote:

> I would like the next reviewer to explain to me what knowledge Dr. Smith specifically has in the area of transitional treatment programs for adults with co-occurring mental health and substance abuse disorders. It is imperative that the next reviewer from Medica be trained in this treatment modality to fully understand the dynamics of Bren's condition and the inner workings of the transitional treatment process in order to fairly and thoroughly assess the medical necessity of Bren's treatment. I do not believe his claims have been fairly reviewed thus far.

35. The Plan responded with a denial written by a registered nurse of unknown qualifications on March 22, 2017. The Plan reiterated the same bases of denial it used in previous denials.

36. Lesli then sent an independent organization review request to the Minnesota Department of Commerce on September 21, 2017. In this request, she highlighted the errors in the Plan's review of her appeals, discussed *supra.* She also noted various ERISA violations in the Plan's review, and asked for the independent reviewer to be someone with the appropriate

7

medical background. She also asked for the reviewer to abide by the ERISA rules and regulations the Plan disregarded, namely that the reviewer describe the basis of denial, what portions of the plan documents s/he relied upon, and what documents s/he reviewed in reaching his/her decision.

37. The independent review was completed by MAXIMUS Federal Services, Inc ("Maximus"). Maximus upheld the Plan's denials for the same reasons the Plan expressed—residential treatment was not medically necessary. Maximus acknowledged that Lesli argued that Foundation House was not a residential treatment facility, but still came to the same conclusion as the Plan.

38. Maximus also added a basis of denial that the Plan had not argued. Maximus argued that even if Brendon's treatment at Foundation House was something other than residential treatment, no such benefit was covered under the plan.

39. As discussed *supra*, UBH/Optum manages Medica's Behavioral Health program. OBH/Optum discusses a "Sober Living Arrangement", which Lesli argued described the level of care provided at Foundation House.

40. If the second denial rationale expressed by Maximus is true, then the Plan's terms violate the Parity Act, as the coverage provided for sub-acute medical/surgical benefits is greater than the coverage from mental health and substance abuse benefits.

41. Robert, Lesli, and Brendon ("the Rauch Family") have incurred treatment expenses that have caused substantial hardship in light of the Plan's denial of coverage that exceed $38,000, charges that should have been paid by the Plan.

42. The Plaintiffs exhausted their pre-litigation appeal process as required under the

terms of the Plan and ERISA.

## CAUSE OF ACTION

(Claim for Benefits Under 29 U.S.C. §1132(a)(1)(B))

43.     ERISA imposes higher-than-marketplace standards on Medica and other ERISA fiduciaries.  It sets forth a special standard of care upon a plan fiduciary, namely that the administrator discharge all plan duties solely in the interest of the participants and beneficiaries of the plan and for the exclusive purpose of providing them benefits.  29 U.S.C. §1104(a)(1).

44.     ERISA also underscores the particular importance of accurate claims processing and evaluation by requiring that plan administrators provide a "full and fair review" of claim denials.  29 U.S.C. §1104(a)(1)(D) and §1133(2).

45.     In addition, ERISA's underlying claims procedures provide clear guidelines for appropriate review of a denied claim including, but not limited to the requirement that individuals who provide reviews based on medical opinions have credentials and expertise equivalent to the claimant's treating physician(s) )C.F.R. §2560.503-1(h)(3)(iii).

46.     Medica's actions or failures to act constitute a breach of its fiduciary duties to the Rauch Family under 29 U.S.C. §1104 and §1133 in the following ways: 1) by failing to set forth the specific reasons for Brendon's claim denial, written in a manner calculated to be understood by the Rauch family;  2) by failing to have the Rauch Family's claim reviewed by individuals with credentials and expertise similar to Brendon's treating physicians; 3) by failing to provide a "full and fair review," as anticipated in ERISA's claims processing regulations, of the denial of the Brendon's claim; and 4) by failing to discharge all plan duties solely in the interest of the participants and beneficiaries of the plan and for the exclusive purpose of providing them

9

benefits.

47. Congress enacted the Parity Act as an amendment to ERISA, making it enforceable through a cause of action under 29 U.S.C. § 1132(a)(3) as a violation of a "provision of this subchapter." *A.F. ex rel. Legaard v. Providence Health Plan,* 35 F.Supp.3d 1298, 1304 (D.Or.2014); *see also* 29 U.S.C. § 1132(a)(3)(A)-(B).

48. The Parity Act requires that if a group health plan provides both medical and surgical benefits as well as mental health or substance use disorder benefits, then it may not apply any "treatment limitation to mental health or substance use disorder benefits in any classification that is more restrictive than the predominant ... treatment limitation of that type applied to substantially all medical/surgical benefits in the same classification." 29 C.F.R. § 2590.712(c)(2)(i) (amended Jan. 13, 2014); *see also* IFRs Under the Parity Act, 75 Fed. Reg. at 5413.

49. The Parity Act also requires that if a plan "provides mental health or substance use disorder benefits in any classification of benefits..., mental health or substance use disorder benefits must be provided in every classification in which medical/surgical benefits are provided." 29 C.F.R. § 2590.712(c)(2)(ii).

50. The Plan violated the Parity Act by imposing a qualitative treatment limitation of 30 hours of eligible treatment per week on residential treatment that is not mirrored in any medical/surgical benefit..

51. The Plan also violated the Parity Act when it failed to provide an analogous mental health or substance abuse benefit to skilled nursing or inpatient rehabilitation, such as the transitional care Brendon received at Foundation House.

52. The actions of Medica and the Plan in failing to provide coverage for Brendon's treatment violate the terms of the Plan, ERISA and its underlying regulations, and the Parity Act.

53. The actions of Medica and the Plan have caused damage to the Rauch Family in the form of denial of payment of Brendon's treatment.

54. Medica and the Plan are responsible to pay for Brendon's treatment claim along with pre-judgment interest and attorney fees and costs pursuant to 29 U.S.C. §1132 (g).

## **RELIEF**

WHEREFORE, Plaintiffs seeks relief as follows:

55. Judgment in the amount of Brendon's past due treatment claim from January 1, 2015 through July 29, 2015;

56. Pre- and post-judgment interest on the past due benefits pursuant to U.C.A. §15-1-1;

57. An award of attorney fees pursuant to 29 U.S.C. §1132(g); and

58. For such further relief as the Court deems equitable.

RESPECTFULLY SUBMITTED this 31st day of January, 2019.

G. ERIC NIELSON & ASSOCIATES


  /s/ Laura Nielson
Laura Nielson
Attorney for Plaintiff